MOORE, Judge.
M.M., who is the maternal grandmother of S.P., J.P., H.H., and E.H. (hereinafter referred to collectively as “the children”), appeals from a judgment entered by the Colbert Juvenile Court (“the juvenile court”) on July 9, 2012, denying her petitions for custody of the children, who had been declared dependent. We affirm.

Facts and Procedural Background

In October and November 2010, the Colbert County Department of Human Resources (“DHR”) picked up the children after discovering that they were living in uninhabitable and inhumane conditions in the home of the children’s mother, J.H. (“the mother”), and Ja.P., the father of S.P. and J.P. and the stepfather of H.H. and E.H. At that time, the mother and Ja.P. did not list the maternal grandmother as a potential relative placement. As part of a safety plan, S.P. and J.P. were placed in foster care and H.H. and E.H. were placed with their paternal grandparents. The juvenile court subsequently adjudicated the children dependent on December 3, 2010.
On February 16, 2011, the maternal grandmother filed a motion to intervene in the dependency proceedings regarding J.P. and S.P. and petitioned for custody of J.P. and S.P. On February 24, 2011, the maternal grandmother filed a similar motion to intervene and petition for custody regarding E.H. and H.H. On February 25, 2011, the juvenile court granted the motions to intervene.
At some point, DHR sent a representative to the home of the maternal grandmother to investigate her suitability for assuming the custody of the children. During the investigation, the DHR representative inquired of the maternal grandmother whether she had ever been involved with DHR. The maternal grandmother denied that she had. DHR subsequently performed a background check and discovered that, in 1994, the Franklin County Department of Human Resources (“the Franklin County DHR”) had filed a report showing that the maternal grandmother was “indicated” for physically abusing and injuring the mother, who was at that time 15 years old, by beating the mother with a belt across the mother’s legs.[1] DHR also learned that the maternal grandmother had observed the conditions in the mother and Ja.P.’s home on a weekly basis before the children were removed from the home, that she had suspected that there might be domestic violence in the home, *379 but that she had not reported any problems to DHR and had not taken any other legal action to assist the children. A DHR social worker testified that the maternal grandmother had made excuses for the mother and for the conditions in the home. Based mainly on those two pieces of evidence, DHR determined that the maternal grandmother lacked the necessary protective capacity to properly care for the children.
The mother initially informed DHR that she did not want the maternal grandmother involved in the cases. E.H. and H.H., who were born in 1998 and 2001, respectively, also expressed a dislike for the maternal grandmother and informed DHR that they did not want to live with her. The mother underwent counseling, in part to deal with her relationship and history with the maternal grandmother, and the counselor had recommended that the mother refrain from having any contact with the maternal grandmother. The mother informed DHR that she had experienced migraine headaches and panic attacks, which, the mother said, became more severe in the presence of the maternal grandmother. The mother further consistently informed DHR’s representatives that she did not want the maternal grandmother to obtain custody of the children. When the juvenile court allowed the maternal grandmother to attend an Individualized Service Plan meeting in April 2012, the maternal grandmother became embroiled in an argument with the mother and falsely accused the paternal grandparents of receiving money to care for E.H. and H.H. A DHR representative and the foster father for J.P. and S.P. had to ask the maternal grandmother to sit down and be quiet so that she would not continue to disrupt the meeting.
DHR also had received accusations that the maternal grandmother had stalked the children. During one visit, it was alleged, the maternal grandmother had told E.H. that the maternal grandmother should have kidnapped the children when she had had the chance, which had alarmed the paternal grandmother. DHR also had noted a report that the maternal grandmother had obtained telephone service in the name of E.H. and had allowed E.H. to search for men on the Internet.
On May 28, 2012, the juvenile court conducted a permanency hearing, which included a dispositional hearing on the maternal grandmother’s petitions for custody. At that hearing, the maternal grandmother testified that she did not recall the 1994 abuse incident and that she was totally unaware that an “indicated” report had been filed against her, which, she said, had resulted in her not having an opportunity to appeal those findings. The maternal grandmother implied that the mother had embellished the circumstances surrounding the abuse allegations and that they had only struggled over the belt. The maternal grandmother also implied that the report had been instigated by her disgruntled ex-husband during a postdivorce custody dispute. The maternal grandmother noted that she had not lost custody of the mother at that time. The maternal grandmother further testified that she had often been forcibly removed by the police from the home of the mother because Ja.P. had not wanted her there, asserting that Ja.P. had prevented her from observing the problems in the home on those occasions and taking action to protect the children. The maternal grandmother admitted, however, that she had never contacted DHR about her concerns regarding the welfare of the children.
Upon cross-examination by counsel for the maternal grandmother, the DHR social worker admitted that DHR did not have a policy of automatically excluding relatives *380 who had previously been indicated for child abuse or neglect. That same social worker also testified that the home of the maternal grandmother had been considered a good home and that DHR had not conducted any further background check on the maternal grandmother.
The maternal grandmother provided the juvenile court with photographs of her home and testified that it was suitable for all four children, who she felt should stay together. The maternal grandmother also testified that she could meet the financial needs of the children. The maternal grandmother testified that she got along well with the mother and theorized that the mother was only trying to please DHR by stating that she did not want the maternal grandmother to have custody of the children. The maternal grandmother’s son, the brother of the mother, testified that the maternal grandmother had been a good parent and would make a good custodian for the children. The mother corroborated that testimony, also stating that she wanted the maternal grandmother to obtain custody of the children if she could not. The paternal grandmother testified that the maternal grandmother had been violent with the mother around the children, that E.H. and H.H. had consistently expressed negative feelings about the maternal grandmother, and that the maternal grandmother had telephoned her occasionally to inquire about the children and had sent them presents, but had never asked to speak to them. The evidence indicated that E.H. and H.H. were adjusted to and doing well in the custody of the paternal grandparents, and the mother testified that she had no problem with them remaining in the paternal grandparents’ custody. The maternal grandmother testified that she had seen J.P. and S.P. only intermittently since they had been taken into foster care.
On July 9, 2012, the juvenile court entered a judgment finding that the maternal grandmother had misled DHR about the previous child-abuse investigation and had observed the children living in deplorable conditions but had failed to act. Considering that evidence, along with the evidence of the troubled past the maternal grandmother shared with the mother and the excuses the maternal grandmother had made for the mother’s poor parenting, the juvenile court denied the maternal grandmother’s petitions for custody. The juvenile court awarded the paternal grandparents custody of E.H. and H.H. and ordered DHR to maintain custody of J.P. and S.P. with a permanency plan for adoption by an unidentified resource. The maternal grandmother filed her notice of appeal on July 23, 2012.

Issues

On appeal, the maternal grandmother argues that the juvenile court erred in denying her petitions for custody without requiring DHR to investigate her current fitness to care for the children and in finding that it would not be in the best interests of the children for the children to be placed in her custody.

Discussion

I. The Duty to Investigate
In Ex parte J.R., 896 So.2d 416 (Ala.2004), the supreme court held that before the state can terminate a parent’s parental rights, the state must prove that the children are dependent and determine whether there exists a remedy less drastic than termination of parental rights. In that respect, the state has the burden of initiating investigations into potential relative custodians and also bears the burden of “ ‘proving] the unsuitability of one who seeks to be considered as the custodian of a dependent child.’ ” 896 So.2d at 428 (quoting D.S.S. v. Clay Cnty. Dep’t of Hu *381 man Res., 755 So.2d 584, 591 (Ala.Civ.App.1999)).
In the present ease, the juvenile court did not terminate the parental rights of the mother or Ja.P., but it adopted a permanency plan calling for the adoption of J.P. and S.P., which requires DHR to file a petition to terminate the mother’s and Ja.P.’s parental rights. See § 12-15-315(a)(2), Ala.Code 1975. The juvenile court thus impliedly found that placing the children with the maternal grandmother was not a viable alternative that would forestall termination of the parental rights of the mother. Such a finding may be, and should be, made in a judgment entered after a permanency hearing. See A.D.B.H. v. Houston Cnty. Dep’t of Human Res., 1 So.3d 53 (Ala.Civ.App.2008); D.P. v. Limestone Cnty. Dep’t of Human Res., 28 So.3d 759, 763 (Ala.Civ.App.2009); and F.V.O. v. Coffee Cnty. Dep’t of Human Res., [Ms. 2110398, Dec. 7, 2012] — So.3d -(AIa.Civ.App.2012). Thus, the maternal grandmother has properly raised the issue whether DHR initiated a proper investigation into her custody petitions in this appeal.
The maternal grandmother argues that she was not fairly investigated because, she says, DHR never conducted a home study, never conducted an investigation into her financial status, and never researched her criminal background. Section 12-15-314(a)(3)c., Ala.Code 1975, provides that, if it is found to be in the best interests of the child, a juvenile court can place a dependent child in the custody of a relative “who, after study by [DHR], is found by the juvenile court to be qualified to receive and cai’e for the child.” Although our caselaw has established that DHR must investigate a potential relative placement, see D.S.S., 755 So.2d at 591, and that the investigation must relate to the current fitness of that relative, see V.M. v. State Dep’t of Human Res., 710 So.2d 915, 921 (Ala.Civ.App.1998), our caselaw has not delineated the standards regarding the adequacy of such an investigation nor has DHR promulgated any regulations setting out the standards for an appropriate investigation. See J.B. v. Cleburne Cnty. Dep’t of Human Res., 991 So.2d 273, 283 (Ala.Civ.App.2008).
Nevertheless, this court has recognized that parents have the responsibility to properly provide their children adequate food, clothing, shelter, health care, education, nurturing, and protection. B.B.T. v. Houston Cnty. Dep’t of Human Res., 89 So.3d 169, 171 (Ala.Civ.App.2011). In considering whether a relative can assume a surrogate parental role for a dependent child, this court has further clarified that
“a relative is ‘fit’ and ‘qualified’ if that relative can safely and properly discharge the parental responsibilities of meeting the child’s needs during the child’s minority. Conversely, a relative is not ‘fit’ or ‘qualified’ if that relative cannot safely and properly discharge parental responsibilities to and for the child or cannot properly care for the child because of the relative’s improper conduct, adverse condition, or inappropriate circumstances.”
J.B., 991 So.2d at 283. Thus, when conducting a “study” of a relative to determine his or her fitness to act as a surrogate parent, DHR is tasked with investigating and assessing those qualities, characteristics, and circumstances affecting the ability and willingness of the relative to meet the basic needs of the child.
 In this case, it appears that DHR began to conduct a thorough investigation of the maternal grandmother by visiting her home and investigating her back *382 ground to gather information regarding her parenting skills. However, during the early stages of that investigation, DHR discovered that the maternal grandmother had been indicated for child abuse against her own child in 1994, which she had implicitly denied, and that she had repeatedly witnessed the neglect of the children at issue in this case but had failed to report their plight to DHR. Cf K.N.F.G. v. Lee Cnty. Dep’t of Human Res., 983 So.2d 1108 (Ala.Civ.App.2007) (holding that Lee County DHR had no duty to investigate relative further after disqualifying him due solely to discovery of 14-year-old felony convictions, one of which involved drug trafficking). If, in the course of an investigation, DHR discovers facts, which, when assessed objectively, would indicate to DHR that a relative presently lacks basic protective capacities, DHR has no duty under any statute or regulation to continue to investigate that relative to determine if he or she has a suitable home environment, a sound financial status, or a clean criminal background, attributes that may be positive but certainly would not be redeeming. Thus, we find no merit in the maternal grandmother’s contention that DHR failed to adequately investigate her before determining that she was unfit to assume the care of the children.
Moreover, we note that, in this case, the juvenile court granted the maternal grandmother a hearing on her petitions for custody of the children. At that hearing, the juvenile court correctly placed the burden on DHR to prove the unfitness of the maternal grandmother, and DHR introduced the evidence outlined above to satisfy that burden. At that point, the juvenile court granted the maternal grandmother an opportunity to rebut DHR’s showing by presenting positive evidence regarding her relationship with the children and her parenting ability. The maternal grandmother proved that she had an adequate home structure and a sound financial condition. No evidence was presented indicating that the maternal grandmother had ever been convicted of a crime. Thus, the juvenile court received all the evidence that the maternal grandmother complains would have been revealed if DHR had conducted a more thorough investigation. See J.B., 991 So.2d at 284 (“In assessing the fitness and qualification of a relative to assume custody of dependent children, the juvenile court is required to consider all the evidence relating to the relative’s ability to serve the best interests of the child.”). The maternal grandmother has failed to show how she was injured by any alleged failure of DHR to more thoroughly investigate her custodial fitness. See Rule 45, Ala. R.App. P. (stating that a judgment cannot be reversed unless “it should appear that the error complained of has probably injuriously affected substantial rights of the parties”).
II. The Sufficiency of the Evidence
Once a child is found dependent, a juvenile court may dispose of the custody of the child according to its determination of the best interests of the child. See § 12-15-314, Ala.Code 1975.
“In Ex parte Alabama Department of Human Resources, 682 So.2d 459 (Ala. 1996), the Alabama Supreme Court stated the applicable principles of appellate review in the context of a challenge to a juvenile court’s custodial disposition of a dependent child:
“ ‘Appellate review is limited in cases where the evidence is presented to the trial court ore tenus. In a child custody case, an appellate court presumes the trial court’s findings to be correct and will not reverse without proof of a clear abuse of discretion or plain er *383 ror. Reuter v. Neese, 586 So.2d 232 (Ala.Civ.App.1991); J.S. v. D.S., 586 So.2d 944 (Ala.Civ.App.1991). This presumption is especially applicable where the evidence is conflicting. Ex Parte P.G.B., 600 So.2d 259, 261 (Ala.1992). An appellate court will not reverse the trial court’s judgment based on the trial court’s findings of fact unless the findings are so poorly supported by the evidence as to be plainly and palpably wrong. See Ex parte Walters, 580 So.2d 1352 (Ala.1991).’
“682 So.2d at 460.”
J.J. v. J.H.W., So.3d 519, 522 (Ala.Civ.App.2008).
In this case, the juvenile court determined that the children should not be placed in the custody of the maternal grandmother because the maternal grandmother had misrepresented her prior involvement with the Franklin County DHR, had failed to act to protect the children from their deplorable living conditions, which she had attempted to justify, and had engaged in a volatile and tempestuous relationship with the mother. In summary, the juvenile court found that the maternal grandmother was not fit and qualified to receive and care for the children so that she should be given preference over a nonrelative caregiver. See § 12-15-314(a)(3)e. (“Unless the juvenile court finds it not in the best interests of the child, a willing, fit, and able relative shall have priority for placement or custody over a non-relative.”). In light of that finding, which we conclude was fully supported by the evidence in the record, although that evidence was in some respects conflicting, we hold that the juvenile court did not err in determining that the best interests of the children would not be served by placing the children in the custody of the maternal grandmother. See M.H.J. v. State Dep’t of Human Res., 785 So.2d 372 (Ala.Civ.App.2000) (holding that grandmother who, among other things, had failed to detect obvious signs of neglect affecting the health of her grandchildren was not a suitable relative resource).
AFFIRMED.
THOMPSON, P.J., and PITTMAN, J., concur.
THOMAS, J., concurs in the result, without writing.

. Child abuse or neglect is ''indicated" "[w]hen credible evidence and professional judgment substantiates that an alleged perpetrator is responsible for child abuse or neglect.” § 26 — 14—8(a)(1), Ala.Code 1975.